Edward Earl LYND, Plaintiff–Appellant,

v.

RELIANCE STANDARD LIFE INSUR-
ANCE COMPANY; Ford Bacon &
Davis, Inc., Defendants–Appellees.

No. 95–30588.

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1996.

Travis M. Holley, Travis M. Holley & Associates, Bastrop, LA, Johnny Carl Parkerson, West Monroe, LA, for Edward Earl Lynd, plaintiff-appellant.

Peter F. Caviness, Dauzat, Falgoust, Caviness, Bienvenu & Stipe, Opelousas, LA, for Reliance Standard Life Insurance Company, defendant-appellee.

F. Drake Lee, Jr., S. Price Barker, Cook, Yancey, King & Galloway, Shreveport, LA, Tracy Ann Burch, Jones, Mitchell & Burch, Shreveport, LA, for defendants-appellees.

Before GARWOOD, EMILIO M. GARZA and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

Bringing this action under ERISA, 29 U.S.C. § 1001, et seq., plaintiff-appellant Edward E. Lynd (Lynd) alleged in his complaint that the benefits he had been receiving pursuant to a long-term disability plan were wrongfully terminated. In his appeal of the district court's rulings on the parties' cross motions for summary judgment, Lynd presently contends that the district court reviewed the plan administrator's decision to terminate these benefits under an inappropriate standard of review, and that the grant of summary judgment dismissing his suit was erroneous.

### Facts and Proceedings Below

Lynd was employed by defendant-appellee Ford, Bacon & Davis, Inc. (FBD) on December 18, 1989. In September of 1990, Lynd became unable to work and began receiving short-term disability benefits under FBD's Employee Welfare Benefit Plan (the plan). After six months, Lynd applied for and began receiving long-term disability benefits. The group policy associated with this long-term disability plan was issued by defendant-appellee Reliance Standard Life Insurance Company (Reliance).

Long-term disability payments were made to Lynd for twenty-four consecutive months. At the close of this two-year period, on March 9, 1993, the plan administrator terminated these payments to Lynd. The administrator made this decision to terminate benefits based on a limitation provision found in both the master policy and the certificate of insurance which stated that, "Monthly Benefits for Total Disability due to mental or nervous disorders will not be payable beyond twenty-four (24) months unless you are in a Hospital or Institution at the end of the twenty-four (24) month period."

Following the termination of these benefits, Lynd filed a petition in the Fourth Judicial District Court of Louisiana alleging that his disability did not result from a "mental or nervous disorder[ ]," and that his benefits under the plan were therefore wrongly terminated by defendants-appellees. The action was removed to federal district court pursuant to 28 U.S.C. § 1331, and the parties thereafter filed cross motions for summary judgment. The district court denied Lynd's motion and, in granting appellees' motion, held that the plan administrator had not abused its discretion in deciding to terminate benefits.

On appeal, Lynd contends that the district court erred by reviewing the plan administrator's decision under an abuse of discretion standard. Lynd argues that the district court should have reviewed the plan administrator's decision de novo. Furthermore, Lynd maintains that, regardless of the standard of review employed, his long-term disability benefits were wrongfully terminated.

### Discussion

Whether the district court employed the appropriate standard in reviewing an eli-

gibility determination made by an ERISA plan administrator is a question of law. *See Chevron Chemical Co. v. Oil, Chemical and Atomic Workers Local Union 4–447,* 47 F.3d 139, 142 (5th Cir.1995). Therefore, we review the district court's decision *de novo.*

In *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 113–17, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), the Supreme Court established that a denial of ERISA benefits by a plan administrator should be reviewed *de novo* by the courts unless the plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." However, it remains unclear precisely what language must be employed in the plan to confer such discretionary authority upon the plan administrator. In *Duhon v. Texaco, Inc.,* 15 F.3d 1302 (5th Cir.1994), this Court applied the analysis from *Bruch* to the language of an ERISA plan and held that *de novo* review was inappropriate because:

> "[I]t is clear that the plan administrator has the discretionary authority to make a final and conclusive determination of the claim. This court has not imposed a linguistic template to satisfy this requirement ... but in this case the plan's plain language provides that the administrator may make an independent and final determination of eligibility." *Id.* at 1305–06 (citations omitted).[1]

Additionally, we have observed that the requisite grant of discretionary authority cannot be inferred from the language of an ERISA plan. In *Chevron Chemical Co., supra,* in the course of holding abuse of discretion was the proper standard of review, we stated that:

> "[T]he Supreme Court 'surely did not suggest [in *Bruch* ] that 'discretionary au-

thority' hinges on incantation of the word 'discretion' or any other 'magic word.' Rather, the Supreme Court directed lower courts to focus on the breadth of the administrators' power—their 'authority to determine eligibility for benefits or to construe the terms of the plan'....' On the other hand, discretionary authority cannot be implied ... 'an administrator has no discretion to determine eligibility or interpret the plan unless the plan language expressly confers such authority on the administrator.'" 47 F.3d at 142 (citations omitted).

In the present case, however, we pretermit the issue regarding which standard of review the district court should have employed in reviewing the plan administrator's eligibility determination. We do so because, regardless of whether the district court reviewed the administrator's eligibility determination for abuse of discretion or *de novo,* the nature of Lynd's disability compelled the district court to conclude that Lynd's long-term benefits under the plan were properly terminated.[2]

■ Section 8.0 of the instant plan includes the limitation that "Monthly Benefits for Total Disability due to mental or nervous disorders will not be payable beyond twenty-four (24) months unless you are in a Hospital or Institution at the end of the twenty-four (24) month period." The parties do not dispute that Lynd remains disabled. Neither, however, is there any suggestion that Lynd was hospitalized or institutionalized on March 9, 1993, at the end of the two-year period during which he received long-term disability benefits. Therefore, this dispute turns on the proper characterization of Lynd's disability; specifically, it must be determined whether or not his disability constituted a "mental or nervous disorder" within

---

1. The plan at issue in *Duhon* addressed the discretionary authority of the administrator in two passages: (1) "The decisions of the Plan Administrator shall be final and conclusive with respect to every question which may arise relating to either the interpretation or administration of this Plan;" and (2) "After you undergo the necessary physical examination(s) and upon review of all facts in the case, the Plan Administrator will make the decision to authorize or deny payments." *Id.* at 1305.

2. Lynd concedes that, if he is found to be disabled as a result of a "mental or nervous disorder," then he cannot recover under the plan; he allows that "it makes absolutely no difference" which standard is employed to review the administrator's determination of eligibility should.his disability be so characterized.

the meaning of this plan. We hold that the district court correctly affirmed the plan administrator's determination that Lynd's disability was due to a "mental or nervous disorder"; therefore, the district court's holding is affirmed regardless of the standard of review employed by the district court in reviewing the plan administrator's eligibility determination.

The undisputed evidence before the district court was that Lynd was diagnosed on September 19, 1990, as suffering from "major depressive disorder." This diagnosis, documented on Lynd's benefits claims form, has remained static since that time.[3]

However, Lynd contends that this general diagnosis of his disability—as a "major depressive disorder"—comports with his claim that his condition is physical in nature. In support of this position, Lynd presented to the district court the deposition (taken well after benefits were denied) of his treating physician, psychiatrist Dr. Dumont, in which Dr. Dumont asserted his belief that depression is a "physical" disorder:

"Q: All right, sir. But I guess the question I am driving at is, depression itself, that is not something caused from a physical disorder itself?

A: Yes, it is. Yes, it is. We think of depression as being a chemical imbalance. It is a malfunction in the part of the brain that controls mood regulation. And we see it as usually an inefficiency of the neurotransmitters or a relative deficit of certain neurotransmitters and we try to treat that by utilization of medications that can help elevate or increase the efficiency of the neurotransmitters.

... Q: All right, sir. So depression in essence results from a nervous disorder as I understand?

A: From a disorder of the central nervous system."

Dr. Dumont further testified that:

"Major depression is a disease and it has a physiologic basis every bit as much as diabetes, hypertension, cardiomyopathy or any other"

and that in his opinion "every major depressive disorder implicate[s] inefficiency of neurotransmitters in the central nervous system."

Dr. Dumont testified regarding the symptoms experienced by Lynd as a consequence of his "major depressive disorder":

"[Lynd] reported symptoms of lack of physical stamina, loss of energy and interest, unable to deal with pressure, unable to make decisions, he had sleep disturbance, he would wake up in a cold sweat with apprehension. He had to leave the office early one day or went to the office early one day and found anxiety so great he had to leave. He has been very anergic meaning no energy and ahdonia [sic] meaning unable to experience pleasure. He thus contacted Dr. Nichols who then referred him to me."

Dr. Dumont expressed the view that "resolution of Mr. Lynd's major depressive disorder would remove his disability."

Dr. Dumont described himself as "a physician who specializes in the practice of psychiatry." He saw Lynd on referral from Lynd's regular physician, but received from the referring physician no "documentation" or "medical reports." When asked if his records reflected "whether Mr. Lynd had any physical disorder or diseases," Dr. Dumont responded, "not of any consequences that would have been connected with this, no." Dr. Dumont treated Lynd with psychoreactive medication and psychotherapy.[4] When asked "You did not conduct a physical exami-

3. The following characterizations of Lynd's disability were attached to Reliance's motion for summary judgment:
(1) In a letter of October 22, 1990, Lynd's treating physician, psychiatrist Dr. Arthur Dumont III, described Lynd's disability as "major depression";
(2) In a letter of April 24, 1991, Dr. Dumont described Lynd's disability as "a severe treatment resistant depression";

(3) In a letter of January 14, 1992, Dr. Dumont described Lynd's disability as "a severe major depressive disorder";
(4) In a letter of May 12, 1993, Dr. Dumont characterized Lynd's disability as a "major depressive illness."

4. The medication included Prozac, Wellbutrin, Lithium, Desyrel, Klonopin, Buspar, Anafranil, Depakote, Cylert, Zoloft, and Serzone.

nation" of Lynd, Dr. Dumont unqualifiedly responded "No, I did not."

This Court has not previously addressed the interpretive issues raised by the allegation that the "physical" aspects of "mental" illnesses necessarily impact the construction of such qualifying phrases as "mental or nervous disorders" used in ERISA plans. However, we find the Eighth Circuit's approach to be instructive:

"It would be improper and unfair to allow experts to define [ERISA plan] terms that were specifically written for and targeted toward laypersons. This requirement provides a source from which we may fashion a federal common law rule; the terms should be accorded their ordinary, and not specialized, meanings.

The cause of a disease is a judgment for experts, while laymen know and understand symptoms. Laymen undoubtedly are aware that some mental illnesses are organically caused while others are not; however, they do not classify illnesses based on their origins. Instead, laypersons are inclined to focus on the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.

... By focusing upon the disease's etiology, the district court considered factors that are important to experts but not to laypersons. The court thus failed to examine the term "mental illness" as a layperson would have, which is the examination we conclude ERISA and federal common law require." *Brewer v. Lincoln National Life Ins. Co.,* 921 F.2d 150, 154 (8th Cir. 1990), *cert. denied,* 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991); *see also Stauch v. Unisys Corp.,* 24 F.3d 1054, 1056 (8th Cir.1994) (observing that when an

ERISA plan participant complained of depression, sleeplessness, impaired concentration and other symptoms, the court concluded that the participant "suffered from what laypersons would consider" a "mental" or "nervous" disorder).[5]

In its DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, the American Psychiatric Association (APA) acknowledges that there is no bright-line distinction between "mental" disorders and "physical" disorders. Nevertheless, the APA also recognizes that, while "there is much 'physical' in 'mental' disorders," the phrase "mental disorder" persists "because we have not found an appropriate substitute." American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS xxi (Fourth Edition, 1994). Accordingly, the APA has not wavered from its classification of Lynd's disability—"major depressive disorder"—as a "mental disorder." *Id.* at 339. Thus, it is not just the lay population that holds to the view that certain disorders are properly and necessarily characterized as "mental disorders," even though what is thus referred to may have a "physical" aspect and/or origin, as well.

The approach taken by the Ninth Circuit in *Patterson v. Hughes Aircraft Co.,* 11 F.3d 948 (9th Cir.1993), is also instructive. In *Patterson,* the court confronted an ERISA plan pursuant to which benefits resulting from "mental, nervous or emotional disorders of any type" would be limited to two years. *Id.* at 949. The court observed that the plan did not define "mental disorder," and held that ambiguities in the plan were to be resolved in favor of the plan participant. *Id.* at 950. In reaching its conclusion that the term "mental disorder" was ambiguous in this context, the court asserted its view that, when a disability was *caused* by "depression," then that disability would be properly character-

5. In identifying the "causes" and "symptoms" of illnesses, it seems that an argument could always be fashioned that the illness itself should be viewed as a "symptom" of some underlying "physical" cause; this is particularly true if one is willing to trace the origins of the illness *ad infinitum.* An illustration of this is provided by Dr. Dumont's testimony that depression repre-

sents a "chemical imbalance" and stems from "an inefficiency of the neurotransmitters ..." The Eighth Circuit reasonably concludes that, within this analytical framework, laymen will look to the "symptom" of an illness in order to characterize that illness, and the symptom "depression" is indicative of a "mental" illness.

ized as resulting from a "mental disorder": "If Patterson's disability was caused solely by his depression, . . . then his condition is subject to the two-year limitation by any possible meaning of the Plan's term 'mental disorder.'" *Id.* at 951.[6]

The court ultimately remanded the case to the district court, concluding that, "[I]f Patterson's headaches contributed to his total disability, or they are either a cause or *symptom* of his depression, then Patterson's disability does not fall within the 'mental disorder' limitation interpreted in his favor." *Id.* at 951 (emphasis added). The court reached this conclusion because the cause of Patterson's disability had not been determined. *Id.*[7] However, the language quoted above would apparently sanction the conclusion that, even if it were established that the cause of Patterson's disability was "depression"—and that Patterson's headaches were only a symptom of his depression—then Patterson's disability would nevertheless fail to constitute a "mental disorder." We disagree with this view, particularly if the court intended that this analysis apply not only to Patterson's headaches, but to all "physical" symptoms of "mental" disabilities. If we begin with the premise that the cause of a disability is "mental"—and the Eighth and Ninth Circuits, as well as the American Psychiatric Association, characterize "depression" as a "mental" disorder—then to find that a disability falls outside of the term "mental disorder" (as used in an ERISA plan) because the disability has "physical" symptoms would render the term "mental disorder" obsolete in this context. As the ERISA plan in the instant case pointedly refers to "mental or nervous disorders," it would be inappropriate to effectively collapse the term "mental disorder" to include only those illnesses, if any exist, which have no "physical" manifestations. If the exclusion of disability, lasting more than twenty-four months, due to "mental or nervous disorders" is to mean anything—and we think it must—then there is no principled basis on which to exclude Lynd's "major depressive disorders" from the reach of that exclusion.

Lynd suffers from "major depressive disorder". There has been no suggestion that Lynd's major depression is in some relevant aspect unusual, nor that his disability is caused by anything other than this disorder. As noted, Dr. Dumont testified that "resolution of Mr. Lynd's major depressive disorder would resolve his disability." Instead, Lynd maintains that his condition falls outside the phrase "mental or nervous disorder" simply *because* "every major depressive disorder," according to Lynd's psychiatrist, has "physical" origins and symptoms. Based on this evidence, the district court was compelled to affirm the plan administrator's eligibility determination, regardless of the standard of review employed by the district court in reviewing this determination.

Accordingly, the judgment of the district court is

AFFIRMED.

DENNIS, Circuit Judge, dissenting.

This court is required to review de novo the district court's decision to grant summary judgment to the insurance company and the employer, applying the same criteria employed by the court in the first instance. *Harper v. Harris County, Texas,* 21 F.3d 597 (5th Cir.1994). Thus, this panel should reverse unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

6. The court's view that disabilities caused by depression fall within the classification of "mental disorders" is further underscored by the following:

   "First, the Plan does not specify whether a disability is to be classified as 'mental' by looking to the cause of the disability or to its symptoms. Since the ambiguity is to be resolved in Patterson's favor, his disability is not a mental disorder subject to the two-year limitation on payments if it is either manifested by headaches though caused by depression, or caused by headaches but manifested by depression.

   Second, the Plan does not make clear whether a disability qualifies as a 'mental disorder' when it results from a combination of physical and mental factors. Patterson's disability may result solely from depression, or solely from headaches, or from a combination of the two. Since this ambiguity must also be resolved in Patterson's favor, he is not within the limitation for mental disorders if his disability is caused in any part by headaches." *Id.* at 950 (citations omitted).

7. Patterson filed his claim for benefits under the ERISA plan at issue in that case "for disability benefits due to headaches." *Id.* at 949.

that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Viewing the evidence and inferences that reasonably may be drawn therefrom in the light most favorable to the non-moving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant law. *Harper v. Harris County, Texas,* 21 F.3d at 600; *King v. Chide,* 974 F.2d 653, 656 (5th Cir.1992).

A denial of benefits under an ERISA plan must be reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). The Group Long Term Disability Insurance policy issued by Reliance to Ford, Bacon and Davis does not contain any language conferring discretionary authority upon Reliance to determine eligibility for benefits or to construe the terms of the plan. The policy insuring clause states: "We will pay a Monthly Benefit if an insured: (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy: (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us." At most, if at all, this provision vests in Reliance some discretion in determining whether the "proof of the Total Disability" was "satisfactory." But the fact that Lynd is totally disabled has been conceded by defendants for purposes of the motion for summary judgment. The only question that has been placed at issue is whether the benefits to which Lynd is entitled are restricted due to the cause of his total disability under a limitation clause which pro-

vides: "Monthly Benefits for Total Disability due to mental or nervous disorders will not be payable beyond twenty-four (24) months unless the insured is in a Hospital or Institution at the end of the twenty-four (24) month period." There is no evidence under the limitations provision or any other part of the policy that Reliance has the power to exercise discretion to make determinations whether a total disability is due to mental or nervous disorders to which the courts must pay deference. Furthermore, there is simply no support for importing the deferential or arbitrary and capricious standard into ERISA on a wholesale basis. *Firestone Tire & Rubber Co.,* 489 U.S. at 109–114, 109 S.Ct. at 953–56. Accordingly, Reliance's denial of benefits challenged by Lynd is to be reviewed under a de novo standard.

The group long term disability insurance policy (non-participating) that covers Lynd is an "employee welfare benefit plan" as defined by ERISA, rather than state contract law. Therefore, federal law governs his claim.[1] *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448 (5th Cir.1995). Congress, in adopting ERISA, expected that "a federal common law of rights and obligations under ERISA-regulated plans would develop." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987); *see also Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). In ascertaining the applicable federal common law, this court has explained we may "draw guidance from analogous state law." *Todd v. AIG Life Ins. Co.* 47 F.3d 1448, 1451 (5th Cir.1995) (quoting) *McMillan v. Parrott,* 913 F.2d 310, 311 (6th Cir.1990) (citation omitted)).

It is well settled in this Circuit and a majority of the federal courts that, in construing the language of ERISA plans, federal law must follow the rule of contra proferentem, which directs that when plan terms

1. It should be noted, however, that if Lynd's claim had been for benefits payable for "services rendered for the treatment of mental or nervous disorders" rather than for disability benefits, state law, viz., La.R.S. 22:669, may have been applicable and required the payment of such benefits "under the same circumstances and con-

ditions as benefits are paid under [the policy] for all other diagnoses, illnesses, or accidents." *Id.* at § 664.A.(1); see *Rudloff v. Louisiana Health Services & Indemnity Company,* 385 So.2d 767 (La.1979); *Hayden v. Guardian Life Ins. Co. of America,* 500 So.2d 831 (La.Ct.App.1986); *Hargroder v. Protective Life Ins. Co.,* 559 So.2d 1367

remain ambiguous after applying ordinary principles of contract interpretation, courts are to construe them strictly in favor of the insured. *Todd v. AIG Life Ins. Co.,* 47 F.3d at 1451–52; *Ramsey v. Colonial Life Ins. Co. of America,* 12 F.3d 472, 479 (5th Cir.1994); *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 982 (5th Cir.1991); *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1257–58 (3d Cir. 1993); *McNeilly v. Bankers United Life Assurance Co.,* 999 F.2d 1199, 1201 (7th Cir. 1993); *Delk v. Durham Life Ins. Co.,* 959 F.2d 104, 106 (8th Cir.1992); *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539–40 (9th Cir.) *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990); *Glocker v. W.R. Grace & Co.,* 974 F.2d 540, 544 (4th Cir.1992); *see also,* Couch on Insurance § 7:12 at 7–23 n. 78 (3d ed.), citing the above and additional authorities, including *Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547 (11th Cir.1994).

In fact, according to the law of every state and the District of Columbia, ambiguities in insurance contracts must be construed against the insurer. *Kunin v. Benefit Trust Life Ins.,* 910 F.2d 534 (9th Cir.1990). "The words, 'the contract is to be construed against the insurer' comprise the most familiar expression in the reports of insurance cases." 2 Couch on Insurance § 22:14 at 22–31 (3d ed.).

Although provisos, exceptions, or exemptions, and words of limitation in the nature of an exception, may be freely contracted for by the insurer, state courts are virtually unanimous in holding that such terms are strictly construed against the insurer where they are of uncertain import or reasonably susceptible of a double construction, or negate coverage provided elsewhere in the policy. *See* 2 Couch on Insurance § 22:31 at 22–66 & 22–67 (3d ed.), and voluminous citations there collected. We may use state common law as a basis for federal common law to the extent that state law is not inconsistent with congressional policy concerns. *Todd v. AIG Life*

*Ins. Co.,* 47 F.3d 1448, 1451 (5th Cir.1995); *Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 647 (7th Cir.1993); *see also Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1257 n. 8 (3rd Cir.1993); *Jamail, Inc. v. Carpenters District Council of Houston Pension & Welfare Trusts,* 954 F.2d 299, 304 (5th Cir.1992). Because the rule that exceptions, exemptions, exclusions, provisions and limitations affecting coverage are construed strictly against the insurer is inherent within the rule of contra proferentem and consistent with congressional policy concerns, it should be recognized as part of the federal common law of rights and obligations under ERISA regulated plans.

What is an ambiguity? An ambiguity exists if reasonable persons can find different meanings in a statute or document, *Laskaris v. City of Wisconsin Dells, Inc.,* 131 Wis.2d 525, 389 N.W.2d 67, 70 (App.1986); when good arguments can be made for either of two contrary positions as to a meaning of a term in a document, *Atlas Ready–Mix of Minot, Inc. v. White Properties, Inc.,* 306 N.W.2d 212, 220 (N.D.1981); when application of pertinent rules of interpretation to an instrument as a whole fails to make certain which one of two or more meanings is conveyed by the words employed by the parties. *Wood v. Hatcher,* 199 Kan. 238, 428 P.2d 799, 803 (Kan.1967). *See also City of Sioux Falls v. Henry Carlson Co., Inc.,* 258 N.W.2d 676, 679 (S.D.1977); *Tastee–Freez Leasing Corp. v. Milwid,* 173 Ind.App. 675, 365 N.E.2d 1388, 1390 (1977); Black's Law Dictionary 79–80 (6th ed. 1990). In this circuit, we have held that "[u]nder Texas law, a contract is ambiguous if, after applying established rules of interpretation, the written instrument 'remains reasonably susceptible to more than one meaning.'" *Clardy Manu. Co. v. Marine Midland Bus. Loans, Inc.,* 88 F.3d 347, 352 (5th Cir.1996) (quoting *R & P Enterprises v. LaGuarta, Gavrel & Kirk,* 596 S.W.2d 517, 519 (Tex.1980)).

The term "total disability due to mental or nervous disorders" in the group long-term

(La.1990); McKenzie & Johnson, 15 Louisiana Civil Law Treatise—Insurance Law and Practice § 291 (Supp.1995). State laws regulating insurance are not preempted by the federal ERISA statute. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d

728 (1985); *Compare Children's Hospital v. Whitcomb,* 778 F.2d 239 (5th Cir.1985) (ERISA preempts R.S. 22:669 under uninsured plans but not under insured plans [such as that insured by Reliance in the present case].).

disability policy is ambiguous because it is susceptible to a number of reasonable interpretations. Clearly, a policy limitation on benefits due to mental illness or disorder is reasonably open to the construction that the total disability must have been caused purely by a behavioral disturbance with no demonstrable organic or physical basis. *See Phillips v. Lincoln Nat. Life Ins. Co.* 978 F.2d 302 (7th Cir.1992) ("mental illness" limitation of ERISA plan was ambiguous as applied to participant suffering from congenital encephalopathy caused by organic illness; "mental illness" may with reason refer only to illnesses with non-physical causes such as those traceable to abuse suffered in childhood or other traumatic experiences such as divorce or bereavement or to a state of being psychotic or out of contact with reality when there is no accepted organic basis for the condition.); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534 (9th Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990) (upheld finding that autism was not a mental illness under an ERISA plan because the term refers to a behavioral disturbance with no demonstrable organic or physical basis.); *Malerbi v. Central Reserve Life of North America Ins. Co.*, 225 Neb. 543, 407 N.W.2d 157 (Neb.1987) (affirming finding that a mental illness limitation did not apply to behavioral abnormalities caused by organic brain defect); *Arkansas Blue Cross & Blue Shield, Inc. v. Doe*, 22 Ark.App. 89, 733 S.W.2d 429 (1987) (because the cause of manic-depressive disease was organic, it was not subject to insurance policy's mental illness limitation).

Other reasonable persons believe, however, that mental illness or mental disorder insurance limitations apply to any abnormal condition that manifests itself in symptoms that an untutored layperson without benefit of medical advice or diagnosis would call mental disorder or illness. *See Brewer v. Lincoln Nat. Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir.1990), *cert. denied*, 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991) (applying a mental illness limitation in an ERISA policy to deny benefits, despite expert evidence that participant suffered from affective mood disorder caused genetically or biologically, because "laypersons are inclined to focus on

the symptoms of an illness; illnesses whose primary symptoms are depression, mood swings and unusual behavior are commonly characterized as mental illnesses regardless of their cause.... Regardless of the cause of his disorder, it is abundantly clear that he suffered from what laypersons would consider to be a 'mental illness' "). Several caveats must be added regarding the *Brewer* case, however. It is one of the few ERISA cases in which a court has rejected the contra proferentem rule; consequently, the *Brewer* court did not construe the limitation strictly against the insurer or consider any other viewpoint than that of an ill read layperson having no expert medical advice about the particular patient in question. Also, without further refinement, the *Brewer* definition of mental illness would apply to, inter alia, an accident victim who exhibits abnormal behavior as the result of a traumatic head injury, a person suffering from brain cancer who develops unusual behavior, an elderly person who has contracted Alzheimer's Disease, and a delirious person suffering from a high fever caused by a staph infection. *See Phillips v. Lincoln Nat. Life Ins. Co.*, 978 F.2d 302, 306 at n. 2. Moreover, the Eight Circuit subsequently partially retrenched from *Brewer* by applying contra proferentem in the ERISA context when an ambiguity cannot be resolved by interpreting the language as would an average plan participant. *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105–106 (8th Cir.1992).

Another somewhat reasonable interpretation of such terms as mental or psychiatric disorder focuses on neither the cause nor symptoms of a psychiatric condition, but on the nature of the treatment involved. *See Simons v. Blue Cross & Blue Shield of Greater New York*, 144 A.D.2d 28, 536 N.Y.S.2d 431 (N.Y.App.Div.1989) (hospitalization for treatment of malnutrition due to anorexia nervosa was not subject to the limitation of coverage applicable to in-hospital care for psychiatric disorders; regardless of whether anorexia nervosa was a mental illness or psychiatric disorder, the purpose of hospitalization was to treat the physical aspects of malnutrition and hypotension, including naso-gastric feeding and medication—thus the hospitalizations were medical treatment, not psychiatric care).

Both the manifestation/symptom and the nature of treatment approaches, reflected in cases such as *Brewer* and *Simons,* have been criticized by commentators as flawed methods of analyzing whether a particular mental illness should be subject to insurance coverage limits or exclusions. Before the development of brain research, reasonably intelligent persons could reach a broad consensus on what was a mental or physical disorder. Steven P. Garmisa, *"Mental Illness" Limitation in Health Insurance Policies,* Chicago Daily Law Bulletin, Nov. 6, 1990 at 2. However, because of medical findings that serious illnesses once considered purely mental, such as schizophrenia, bipolar affective disorder, and depressive illness are physical brain diseases, reasonable persons can disagree sharply on the meaning of "mental or nervous disorder." The average layperson's understanding should be constantly changing with advances in medical research. As the public learns more about the actual causes and treatments for mental illness, it follows that the average layperson's understanding of terms such as "mental illness" and "psychiatric treatment" will change as well. Brian D. Shannon, *The Brain Gets Sick, Too—The Case For Equal Insurance Coverage For Serious Mental Illness,* 24 St. Mary's L.J. 365, 370–382 (1993).

Nevertheless, regardless of any arguments over their merits, there are at least three reasonable interpretations of insurance coverage limitations upon benefits payable because of disability or treatment due to mental disease, disorder or illness. In particular, the limitation at issue in the present case upon benefits for "Total Disability due to mental or nervous disorders" is susceptible to each of the three reasonable interpretations. The term is not defined in the policy and it remains ambiguous after applying ordinary principles of contract interpretation. Therefore, applying the rule of contra proferentem in accordance with this Circuit's precedents of *Todd v. AIG Life Ins. Co., supra; Ramsey v. Colonial Life Ins. Co. of America, supra;* and *Hansen v. Continental Ins. Co., supra,* the term should be construed strictly against the insurer and in the reasonable sense that is most favorable to the insured,

viz., that "total disability due to mental or nervous disorders" means a behavioral disturbance with no demonstrable organic or physical basis.

Consequently, summary judgment is not appropriate because the record discloses that there is a genuine issue as to a material fact, i.e., whether Lynd suffers from a total disability due to a behavioral disturbance with no demonstrable organic or physical basis, and that the moving party is not entitled to a judgment as a matter of law. In opposition to Reliance's motion for summary judgment and in support of his own, Lynd filed the deposition of his treating psychiatrist who testified that Lynd was totally disabled due to a major depression that has a physiologic basis every bit as much as diabetes, hypertension, cardiomyopathy or other diseases and is caused by the dysfunction of the neurotransmitters in his brain. *See* Deposition of Arthur Dumont, III, M.D., at pages 31, 39, 40, 43, 49, 42, 52, 56, 57 (attached to the motions for summary judgment filed by Lynd and Reliance). Clearly, the doctor's testimony provides the basis for a reasonable trier of fact to find or infer that Lynd is totally disabled due to a major depression having an organic or physiologic basis and not due to a behavioral disturbance with no demonstrable organic or physical basis. In conducting summary judgment review a court must keep in mind that summary judgment should be granted when no genuine issue of material fact exists and when the moving party is entitled to judgment as a matter of law. This standard closely resembles that used for entry of a directed verdict, where the district court must direct a verdict if there can be only one reasonable decision made under the governing law. *London v. MAC Corp. of America,* 44 F.3d 316 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 99, 133 L.Ed.2d 53 (1995); *Boeing v. Shipman,* 411 F.2d 365 (5th Cir.1969).

The District Court did not actually reach the issues discussed here because it failed to appreciate that a de novo review of Reliance's denial of benefits is required by *Firestone* under the policy and limitation clause at issue. That court fell into error by applying deference in reviewing Reliance's denial

of benefits and concluding that the insurer had not acted arbitrarily or capriciously. Significantly, however, the district court stated that it might have reached a different result had it applied the de novo standard, indicating that it might have refused to grant a summary judgment for Reliance had it made a plenary review of the policy and limitation of coverage provision.

My colleagues in the majority have fallen into error in affirming the trial court's result because they likewise failed to perform a de novo review of the policy and its limitation provision and because they failed to follow the precedents of this Circuit which require the application of the rule of contra preferentem. If they had not lapsed in these respects they surely would have recognized that the limitation clause is ambiguous, construed it strictly against the insurer, realized that under the reasonable interpretation that is most favorable to Lynd there is a genuine dispute as to a material fact and that Reliance is not entitled to judgment as a matter of law, and would have reversed the summary judgment and remanded the case for trial or further proceedings.